IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

CARMEN M. OCASIO-HERNANDEZ, et al.,

    Plaintiffs,

    v.

LUIS FORTUNO-BURSET, et al.,

    Defendants.

Civil No. 09-1299 (GAG)

**OPINION AND ORDER**

The parties to this case are well-known to each other and the court. The background of this case has been detailed at length by both the district court (Docket No. 68) and the First Circuit (Docket No. 76). Therefore, the court discusses the facts and background necessary to adjudicate the claims pertaining to the only remaining defendant, Vel-Marie Berlingeri ("Berlingeri"). On April 2, 2012, Governor Luis Fortuño, Luce Vela, Juan Carlos Blanco and Berlingeri (collectively "Defendants") filed a motion for summary judgment (Docket No. 145). Plaintiffs opposed said motion (Docket No. 157). Subsequently, on July 6, 2012, the court granted the motion as to Defendants Fortuño, Vela and Blanco. (Docket No. 173.) The court withheld judgment regarding Berlingeri in order to hold oral arguments and to engage in a deeper analysis. (See id.) The court held oral arguments on August 8, 2012, regarding Defendants' motion for summary judgment as to Berlingeri.

As the court has previously dismissed the claims against all Defendants, except for Berlingeri, the court's factual background and analysis focuses on Berlingeri accordingly. Plaintiffs' federal claim is brought pursuant to 42 U.S.C. § 1983, and Plaintiffs' state law claims are brought pursuant to Puerto Rico Law No. 131 of May 13, 1943, P.R. LAWS ANN. tit. 1, §§ 13-19 ("Law 131"), and Articles 1802 and 1803 of the Civil Code of Puerto Rico ("Articles 1802 and 1803"), P.R. LAWS ANN. tit. 31, §§ 5141 and 5142. Defendants motion for summary judgment was filed at

**Civil No. 09-1299 (GAG)**                    2

Docket No. 145, which Plaintiffs opposed at Docket No. 157. After reviewing these submissions and the pertinent law, the court **GRANTS** Defendants' motion for summary judgment at Docket No. 145 as it pertains to Berlingeri.

**I.     Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See FED.R.CIV.P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case.

The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED.R.CIV.P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable

**Civil No. 09-1299 (GAG)**                3

inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

**II.    Relevant Factual Background**

After Fortuño was elected, Berlingeri took office as the Administrator of the Office of the Governor. (See Docket Nos. 143 at ¶ 1(e); 158 at ¶ 1(e). Fortuño issued a series of executive orders implementing a number of fiscal controls on government spending. (See Docket Nos. 143 at ¶¶ 1(h-i).) Among these executive orders was 2009-002, which delegates to Berlingeri the power "to take any necessary actions and sign any necessary official documents related to the administration of the Office of the Governor." (Docket No. 156-2.) Pursuant to this order, Berlingeri was in charge of the administration of La Fortaleza. (See Docket Nos. 143 at ¶ 1(p); 158 at ¶ 1(p).)

Working with Berlingeri were Plaintiffs' supervisors: Beatriz Garcia ("Garcia"), and her subordinates Erica Candelaria ("Candelaria") and Medeline Toro ("Toro"). (See Docket Nos. 143 at ¶ 1(cc); 158 at ¶ 1(cc); 143-9 at 133.) Garcia was the Director of the Executive Mansion. (See Docket Nos. 143 at ¶ 1(cc); 158 at ¶ 1(cc).) Berlingeri states she terminated Plaintiffs upon recommendations from Garcia, Candelaria, and Toro. (See Docket No. 143-9.) However, no written recommendations or reports have been submitted into evidence. (See id.)

Plaintiffs held trust positions at La Fortaleza, a type of employment that allows Defendants to terminate Plaintiffs employment without cause. Plaintiffs received a document titled "Regulation for Human Resources Administration in the Trust Service" upon commencing their duties –a document which explains the terms of trust employment. (See e.g., Docket Nos. 143 at ¶ 2(b); 158 at ¶ 2(b).) Further, it is uncontested that Plaintiffs were terminated by way of letters signed by Berlingeri and dated February 27, 2009 or March 11, 2009. (See e.g., Docket Nos. 143 at ¶ 2(f); 158 at ¶ 2(f).) Approximately two weeks before Plaintiffs' termination, Figueroa overheard Vela and Berlingeri speaking in a tea room. (See Docket No. 169-4.) Figueroa states Vela said, "We have to clean the kitchen," to which Berlingeri responded, "But, there are so many." (See id.)

Also working at La Fortaleza was Cesar Batine ("Batine"), who supervised the Governor's

**Civil No. 09-1299 (GAG)**                                4

residence under the previous administration and was highly recommended by Former Governor Acevedo and his wife. (See Docket Nos. 143 at ¶ hh; 158 at hh.) Batine was not terminated from his position when Governor Fortuño's administration took control. (See id.)

### A. Facts Specific to Carlos Santos Rivera.

Garcia monitored and gave oral feedback to Santos regarding his work. (See Docket Nos. 143 at ¶ hh; 158 at ¶ 2(hh).) Primarily, Garcia directed the activities of Rivera and those working in the Governor's Mansion. (See Docket No. 156-6 at 14.) At times, Toro would substitute for Garcia. (See Docket No. 156-6 at 14.) Santos informed Garcia as to the work accomplished and Garcia verified that information through observation. (See Docket Nos. 143 at ¶ 2(hh); 158 at ¶ 2(hh).) The parties agree that the entrance to the Governor's Mansion was dirty; however, they disagree over the reasons why the staff failed to clean the area. (See Docket Nos. 143 at ¶ 2(kk); 158 at ¶ 2(kk).)

### B. Facts Specific as to Ivan Rivera Canales.

Rivera received his appointment through the wife of an NPP representative. (See Docket Nos. 143 at ¶ 3(b); 158 ¶ 3(b).) From the time Rivera began working at La Fortaleza until his termination on February 27, 2009, Rivera was a member of the NPP. (See Docket Nos. 143 ¶ 3(n); 158 ¶ 3(n).) Rivera admits he voted for Fortuño. (See Docket Nos. 143 at ¶ 3(t); 158 at ¶ 3(t).) No defendant asked Rivera what political party he was affiliated with or when he began working at La Fortaleza. (See Docket Nos. 143 at ¶ 3(hh); 158 at ¶ 3(hh).)

### C. Facts Specific to Gerardo Pizarro Pizarro.

Pizarro began working at La Fortaleza on September 18, 2000. (See Docket No. 156-16 at 18.) At that time, he identified with the NPP, but by 2004 he affiliated himself with the PDP. (See Docket Nos. 143 at ¶¶ 4(v, cc); 158 at ¶ 4(v, cc).) The only coworker Pizarro spoke to regarding politics was Guerrero, and that occurred outside of the workplace. (See Docket Nos. 143 at ¶¶ 4(t, u); 158 at ¶¶ 4(t, u).) Pizarro never heard rumors about a list of PDP employees who were going to be terminated. (See Docket Nos. 143 at ¶ 4(x); 158 at ¶ 4(x).)

**Civil No. 09-1299 (GAG)**                                                5

    **D.**    **Facts Specific to Juan Carrasquillo Lopez.**

Carrasquillo began working at the Executive Mansion on May 1, 2002. (See Docket Nos. 143 at ¶ 5(a); 158 at ¶ 5(a).) After Fortuño took office, Carrasquillo never saw any political propaganda for any party in La Fortaleza. (See Docket No. 156-19 at 10-11.) Berlingeri and Carrasquillo did not speak about politics and politics were not discussed at work with other employees. (See Docket Nos. 143 at ¶ 5(r, s); 158 at ¶ 5(r, s).) While a member of the PDP party, Carrasquillo was not an activist and his political participation was limited to voting on Election Day. (See Docket Nos. 143 at ¶ 5(w); 158 at ¶ 5(w).) Carrasquillo admits that ticks were found in a rug within the Governor's Mansion. (See Docket Nos. 143 at ¶ 5(y); 158 at ¶ 5(y).)

    **E.**    **Facts Specific to Hector Guerrero Frau.**

Guerrero began working at La Fortaleza on December 13, 1999. (See Docket No. 156-23 at 3.) He attended some PIP meetings in the early 1990's; however, he has not been politically active since that time. (See Docket Nos. 143 at ¶ 6(i); 158 at ¶ 6(i).) Garcia initially supervised Guerrero. (See Docket Nos. 143 at ¶ 6(k); 158 at ¶ 6(k).) Guerrero did not see any political propaganda within La Fortaleza and he never spoke about politics with any Defendant. (See Docket Nos. 143 at ¶¶ 6(m, p); 158 at ¶¶ 6(m, p).) Guerrero never heard of a list of employees that were going to be terminated. (143 at ¶ 6(s); 158 at ¶ 6(s).)

    **F.**    **Facts Specific to Jorge Rodriguez Figueroa.**

Rodriguez began working at La Fortaleza on September 1, 1988. (See Docket No. 156-26.) Rodriguez did not see any political propaganda in La Fortaleza after the new administration took over in 2009. (See Docket Nos. 143 at ¶ 7(m); 158 at ¶ 7(m).) Rodriguez never spoke with Berlingeri. (See Docket Nos. 143 at ¶¶ 7(m, n); 158 at ¶¶ 7(m, n).) Rodriguez never heard Berlingeri or any Defendants make any negative comments regarding the prior PDP administration, nor did he hear any Defendant say those terminated were affiliated with the PDP. (See Docket Nos. 143 at ¶¶ 7(u, v).; 158 at ¶¶ 7(u, v).) Politics were not discussed at La Fortaleza or the Executive Mansion and Rodriguez did not share his political affiliation with any other employee. (See Docket Nos. 143 at ¶¶ 7(w-y); 158 at ¶¶ 7(w-y).) Rodriguez's political participation in the 2008 election

**Civil No. 09-1299 (GAG)**                                6

was limited to voting. (See Docket Nos. 143 at ¶ 7(ff); 158 at ¶ 7(ff).)

### G. Facts Specific to Carmen Ocasio Hernandez.

Ocasio began working on July 1, 2004. (See Docket Nos. 143 at ¶ 8(a); 158 at ¶ 8(a).) Ocasio did not see any political propaganda displayed within La Fortaleza. (See Docket Nos. 143 at ¶ 8(l); 158 at ¶ 8(l).) She never spoke to any Defendant from the time the new administration took control of La Fortaleza to her termination. (See Docket Nos. 143 at ¶ 8(m); 158 at ¶ 8(m).) Garcia supervised Ocasio. (See Docket Nos. 143 at ¶ 8(o); 158 at ¶ 8(o).) Ocasio did not discuss politics with Garcia or Candelaria. (See Docket Nos. 143 at ¶¶ 8(p, r); 158 at ¶¶ 8(p, r).) Ocasio never heard any disparaging comments regarding the past administration, nor any justification for her termination. (See Docket Nos. 143 at ¶¶ 8(y, aa); 158 at ¶¶ 8(y, aa).) She is a member of the PDP, but did not campaign on behalf of the party. Her only activity was voting. (See Docket Nos. 143 at ¶ 8(bb); 158 at ¶ 8(bb).)

### H. Facts Specific to Angel Baez Torres.

Baez began working at La Fortaleza on February 5, 2008. (See Docket Nos. 143 at ¶ 9(a); 158 at ¶ 9(a).) Baez was never asked political questions and he never heard anyone speak about politics. (See Docket Nos. 143 at ¶¶ 9(f, g); 158 at ¶¶ 9(f, g).) Baez's only communication with Berlingeri was short greetings. (See Docket Nos. 143 at ¶ 9(s); 158 at ¶ 9(s).) Baez was informed through a coworker that Berlingeri had complaints as to the cleanliness of her office and windows. (See Docket Nos. 143 at ¶ 9(gg); 158 at ¶ 9(gg).)

### I. Facts Specific to William Burgos Castellano.

Burgos began working at La Fortaleza on November 30, 2006. (See Docket Nos. 143 at ¶ 10(a); 158 at ¶ 10(a).) Burgos was the only employee assigned to Jajome, the country home of the Governor. (See Docket Nos. 143 at ¶ 10(k); 158 at ¶ 10(k).) No supervisor was stationed at Jajome with Burgos. (See id.) Santos was Burgos' supervisor and would go to Jajome roughly once a month, but sometimes a month would go by without a site visit. (See Docket No. 156-36 at 7-8.) The home was not kept in a clean state. (See Docket No. 143-9 at 2.) From the time Governor Fortuño's administration took over, Burgos did not visit La Fortaleza. (See Docket Nos. 143 at ¶

**Civil No. 09-1299 (GAG)**                               7

10(o); 158 at ¶ 10(o).) Burgos did not see political propaganda either inside or outside La Fortaleza. (See Docket Nos. 143 at ¶ 10(q); 158 at ¶ 10(q).)

Burgos handed out leaflets supporting two mayoral candidates in 2008, but did not publicly support the PDP candidate for governor. (See Docket Nos. 143 at ¶ 10(u); 158 at ¶ 10(u).) Burgos did not discuss his political affiliation with other employees. Burgos never heard Defendants make any derogatory remarks towards the PDP. (See Docket Nos. 143 at ¶ 10(t, z); 158 at ¶ 10(t, z).)

### J.   Facts Specific to Victor Camacho Pizarro.

Camacho began working at La Fortaleza on March 16, 2004. (See Docket Nos. 143 at ¶ 11(a); 158 at ¶ 11(a).) Figueroa was in charge of the warehouse, while Camacho was his assistant. (See Docket Nos. 143 at ¶¶ 11(q, r); 158 at ¶¶ 11(q, r).) Both were in charge of the food supply inventory. (See id.) Camacho knew Berlingeri by sight, but the two had not been formally introduced. (See Docket Nos. 143 at ¶ 11(p); 158 at ¶ 11(p).) Camacho never saw any political propaganda within La Fortaleza. (See Docket Nos. 143 at ¶ 11(m); 158 at ¶ 11(m).) Camacho never heard Defendants speak negatively about the prior administration, or Defendants attempting to link the staff to the prior administration. (See Docket Nos. 143 at ¶¶ 11(v-x); 158 at ¶¶ 11(v-x).) Berlingeri complained about Camacho's job performance on two occasions. (See Docket No. 156-40 at 11, 15-16.) Camacho cannot identify the political affiliations of those who work at the Governor's Mansion or his co-Plaintiffs in this case. (See Docket Nos. 143 at ¶¶ 11(dd-ee); 158 at ¶¶ 11(dd-ee).) Camacho was not politically active, other than casting his vote. (See Docket Nos. 143 at ¶ 11(jj); 158 at ¶ 11(jj).)

### K.   Facts Specific to Angel Figueroa Rolon.

Figueroa began working at La Fortaleza on August 5, 1991. (See Docket Nos. 143 at ¶ 12(a); 158 at ¶ 12(a).) Figueroa never spoke with Berlingeri. (See Docket No. 156-44 at 17.) None of Figueroa's supervisors or coworkers made any comments regarding the previous administration or political comments in general. (See Docket Nos. 143 at ¶¶ 12(t-v); 158 at ¶¶ 12(t-v).) Garcia was Figueroa's immediate supervisor. (See Docket Nos. 143 at ¶ 12(ff); 158 at ¶ 12(ff).) Figueroa does not know whether Defendants know his political affiliation. (See Docket Nos. 143 at ¶ 12(bb); 158

**Civil No. 09-1299 (GAG)**                                    8

at ¶ 12(bb).) Figueroa knows some of the staff hired by previous administrations remained at La Fortaleza after his termination, and he knows some of those staff members are members of the PDP. (See Docket Nos. 143 at ¶¶ 12(cc, ee); 158 at ¶ 12(cc, ee).)

### L.  Facts Specific to Nydia Diaz Francisco.

Diaz began working at La Fortaleza on February 1, 2001. (See Docket Nos. 143 at ¶ 13(a); 158 at ¶ 13(a).) Diaz washed and ironed the laundry. (See Docket Nos. 143 at ¶ 13(b); 158 at ¶ 13(b).) Diaz did not see any political propaganda during the time of the NPP administration. (See Docket Nos. 143 at ¶ 13(l); 158 at ¶ 13(l).) Diaz was not politically active in the last five gubernatorial elections. (See Docket Nos. 143 at ¶ 13(m); 158 at ¶ 13(m).) Diaz never heard Berlingeri make any political comments. (See Docket Nos. 143 at ¶ 13(n); 158 at ¶ 13(n).) Diaz never spoke or met with Berlingeri, nor did she hear those terminated were affiliated with the PDP. (See Docket Nos. 143 at ¶¶ 13(o, r); 158 at ¶¶ 13(o, r).) Diaz did not discuss politics with her coworkers. (See Docket Nos. 143 at ¶ 13(v); 158 at ¶ 13(v).)

### M.  Facts Specific to Felicita Rivera Baez.

Rivera Baez began working in the laundry room at La Fortaleza on February 1, 2008. (See Docket Nos. 143 at ¶ 14(a); 158 at ¶ 14(a).) She missed fourteen work days in February 2009. (See Docket Nos. 143 at ¶ 14(d); 158 at ¶ 14(d).) Garcia was Rivera Baez's supervisor. (See Docket Nos. 143 at ¶ 14(z); 158 at ¶ 14(z).) Rivera Baez never met or spoke with Defendants. (See Docket Nos. 143 at ¶¶ 14(h-i); 158 at ¶¶ 14(h-i).) Rivera Baez never saw political propaganda in La Fortaleza. (See Docket Nos. 143 at ¶ 14(m); 158 at ¶ 14(m).) She cannot identify the political parties of any maintenance staff. (See Docket Nos. 143 at ¶ 14(p); 158 at ¶ 14(p).) Rivera Baez never spoke about politics while at work. (See Docket Nos. 143 at ¶ 14(r); 158 at ¶ 14(r).) Rivera Baez knows there were staff members affiliated with the PDP that remained on staff after she was terminated. (See Docket Nos. 143 at ¶ 14(y); 158 at ¶ 14(y).)

### N.  Facts Specific to Diana Rodriguez Vicente.

Rodriguez Vicente also worked in the laundry room, beginning on September 11, 1989. (See Docket Nos. 143 at ¶ 15(a); 158 at ¶ 15(a).) Garcia was her supervisor at the time of her

**Civil No. 09-1299 (GAG)**                                                              9

termination. (See Docket Nos. 143 at ¶ 15(bb); 158 at ¶ 15(bb).) Rodriguez Vicente did not see any political propaganda in La Fortaleza after the new administration took over. (See Docket Nos. 143 at ¶ 15(m); 158 at ¶ 15(m).) She never met or spoke with Defendants. (See Docket Nos. 143 at ¶ 15(n); 158 at ¶ 15(n).) She never heard Defendants make any derogatory comments pertaining to the previous administration. (See Docket Nos. 143 at ¶ 15(r); 158 at ¶ 15(r).) The only person at La Fortaleza to whom Rodriguez Vicente told her political affiliation was Rivera Baez. (See Docket Nos. 143 at ¶ 15(s); 158 at ¶ 15(s).) Rodriguez Vicente only knew the political affiliation of two employees at La Fortaleza. (See Docket Nos. 143 at ¶ 15(u); 158 at ¶ 15(u).) She did not hear rumors that those terminated were affiliated with the PDP. (See Docket Nos. 143 at ¶ 15(w); 158 at ¶ 15(w).)

### III.   Legal Analysis

#### A.   Section 1983 Claims

Plaintiffs bring their claims under 42 U.S.C. § 1983 alleging violations of the First Amendment to the United States Constitution. Section 1983 creates a remedy for those who are deprived of the rights, privileges, or immunities granted to them by the Constitution or laws of the United States. See Rodriguez Garcia v. Municipality of Caguas, 354 F.3d 91, 99 (1st Cir. 2004) (citing Baker v. McCollan, 443 U.S. 137, 144 n.3, (1979)). To succeed on a Section 1983 claim, Plaintiffs must prove that someone has deprived them of a right protected by the Constitution or the laws of the United States and the perpetrator acted under color of state law. Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 621 (1st Cir. 2000).

#### B.   First Amendment Political Discrimination

The First Amendment protects non-policymaking public employees from adverse employment actions based on their political affiliation. See Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990); Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000). A *prima facie* case of political discrimination requires evidence that: (1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's opposing political affiliation; (3) a challenged employment action occurred; and; (4) political affiliation was

**Civil No. 09-1299 (GAG)**                                    10

a substantial or motivating factor behind the challenged employment action. See Martinez-Velez v. Rey-Hernandez, 506 F.3d 32, 39 (1st Cir. 2007); Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006). Plaintiff "must point 'to evidence on the record which, if credited, would permit a rational fact-finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus.'" Gonzalez-de-Blasini v. Family Dept., 377 F.3d 81, 85 (1st Cir. 2004) (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)). Additionally, the plaintiff "must make a fact-specific showing that a causal connection exists between the adverse treatment and the plaintiff's political affiliation." Aviles-Martinez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990)).

If the plaintiff proves his *prima facie* case, the burden shifts to the defendant to articulate a nondiscriminatory ground for the adverse employment action and establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's political beliefs. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977) ("Mt. Healthy Defense"). In response, "the plaintiff may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." Padilla-Garcia, 212 F.3d at 77 (internal citations omitted). In the end, "[s]ummary judgment is warranted 'only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the adverse employment action.'" Mendez-Aponte v. Puerto Rico, 656 F. Supp. 2d 277, 285 (D.P.R. 2009) (quoting Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994)).

In their motion for summary judgment, Defendants contend Plaintiffs failed to establish a *prima facie* case of political discrimination. (See Docket No. 145 at 6, 15.) They argue that Plaintiffs' claims of political discrimination are not supported by the evidence. (See id.) As to Plaintiff Rivera, Defendants claim he has failed to demonstrate the first element of the *prima facie* case. As to the remaining Plaintiffs, Defendants aver that they failed to demonstrate the second and fourth elements.

       **1.**     **Ivan Rivera Canales**

**Civil No. 09-1299 (GAG)** 11

Defendants isolate Rivera from the rest of Plaintiffs because he was a member of the NPP for the duration of his employment at La Fortaleza. Additionally, he admits to having voted for Governor Fortuño in the 2008 election. There is no evidence that Rivera was thought to be a member of the PDP or was treated as a member of the PDP. Nor is this is a case where Rivera was a member of a different faction of the same political party. See Padilla-Garcia, 212 F.3d at 76. The first element of the *prima facie* case requires Rivera to show that he belonged to an opposing political affiliation. Rivera's claim fails because he was member of the same political party as Defendants and voted for Governor Fortuño.

Therefore, the court **GRANTS** Defendants motion for summary judgment as to Rivera (Docket No. 145).

### 2. Remaining Plaintiffs

Defendants claim the remaining Plaintiffs failed to establish that Berlingeri had knowledge of Plaintiffs' political affiliations and that Plaintiffs failed to establish their terminations stemmed from political animus. (See Docket No. 145 at 6, 15.) The parties disagree whether Berlingeri had knowledge of Plaintiffs' political affiliations. However, because the court dismisses Plaintiffs' claims on alternative grounds, the court refrains from passing judgment on the knowledge requirement.

The fourth prong of the *prima facie* case requires Plaintiffs to demonstrate that their terminations stemmed from politically based discriminatory animus. See Gonzalez-de-Blasini, 377 F.3d at 85. Plaintiffs conclude the *prima facie* case has been demonstrated, but fail to cite facts on the record that would allow the court to agree. (See Docket No. 157 at 13-15.) Plaintiffs describe the atmosphere at La Fortaleza as politically divisive and rife with animosity towards the past PDP administration. (See id. at 157 at 12.) Plaintiffs ask the court to view their claims through this lens of extreme partisanship. However, the uncontested facts paint a different picture. Plaintiffs testified, in their respective depositions, that they did not see political propaganda displayed at La Fortaleza. (See e.g., 156-19 at 10-11.) Plaintiffs were never asked their political affiliation or for whom they voted. Plaintiffs claim a political atmosphere existed mainly based on one employee's cell phone

**Civil No. 09-1299 (GAG)**                                      12

cover and ringtone (Docket No. 157 at 12); however, that fact does not support the hyper-partisan atmosphere Plaintiffs allege existed.

In order to show political animus, Plaintiffs point to one conversation overheard between Vela and Berlingeri regarding the cleaning of the kitchen. At best, this conversation is ambiguous as to whether it refers to terminating the kitchen staff. But even if read in that light, it makes no reference to politics whatsoever. The conversation never mentions political parties or the political affiliation of those employed in the kitchen. This conversation does not establish political animus against those affiliated with the PDP. Further, whatever inference can be drawn as to political animus is contradicted by the retention of Batine and other non-NPP staff members. Batine was in charge of the Governor's residence, affiliates with the PDP and was recommended by former Governor Acevedo. (See Docket Nos. 143 at ¶ 1(hh); 158 at ¶ 1(hh).)

Next, Plaintiffs attack the process implemented by Berlingeri to hire new workers at La Fortaleza as inherently discriminatory. (See Docket No. 157 at 10.) Here, Berlingeri, along with roughly ten to twenty others, reviewed applications for positions within La Fortaleza. Berlingeri states some of these applications were forwarded to her from politicians belonging to all the political parties on the island. (See Docket No. 158-2 at 17.) Plaintiffs conclude, without pointing to evidence, that this process was designed to ensure those hired were affiliated with the NPP. However, the testimony does not create the inference that this process was partisan. The evidence demonstrates that politicians from all political parties submitted resumes and those hired were not exclusively members of the NPP. The evidence does not support Plaintiffs' assertion that the hiring process was politically motivated.

This is important to Plaintiffs assertion that they were terminated due to political animus because, as Plaintiffs' argue, all hiring and firing decisions were made in an effort to hire those affiliates of the NPP and to terminate those affiliates of the PDP. It is uncontested that Berlingeri was the one who signed the termination letters, but it is also uncontested that Berlingeri relied upon the recommendations of Garcia and her subordinates Candelaria and Toro. (See Docket No. 143-9.) Plaintiffs point to no evidence that indicates Garcia, Candelaria or Toro harbored any political

**Civil No. 09-1299 (GAG)**                                13

animus towards PDP affiliates. The evidence demonstrates that non-NPP employees remained at La Fortaleza after Plaintiffs were terminated. Plaintiffs failed to demonstrate those who replaced them were members of the NPP.

In order to successfully show political animus was a motivating factor, Plaintiffs must demonstrate a causal connection between their terminations and the political animus held by the decision makers. See Monroig, 963 F.2d at 5. In this case, Berlingeri ultimately terminated Plaintiffs based on the recommendations of Garcia and her subordinates. In Peguero-Moronta v. Santiago, the First Circuit faced a similar situation in which a supervisor "rubber-stamped" the termination recommendation of a subordinate. 464 F.3d 29, 51 n.9 (1st Cir. 2006). After discussing the lack of evidence implicating the supervisor acted with political animus, the circuit affirmed the dismissal of claims against the supervisor. See id.

This is not a case in which the subordinates' political animus can be imputed to Berlingeri. Plaintiffs decided not to name Garcia, Candelaria and Toro as defendants to this action. They were not deposed in connection with this action. There is no testimony from these individuals on the record before the court. This may be due to Plaintiffs failure to schedule depositions for these witnesses before the discovery deadline. The court notes Magistrate Judge Arenas' Order denying Plaintiffs' request to extend the discovery deadline in order to schedule additional depositions. (See Docket No. 118.) Plaintiffs' failure to adduce evidence of political animus by Berlingeri or her subordinates is critical to their case. Without this evidence, the court is unable to infer that political discrimination was a substantial or motivating factor behind their terminations.

Ultimately, it is Plaintiffs' burden to demonstrate a causal connection between their terminations and political animus on the part of Berlingeri. Plaintiffs have failed to do so. The facts adduced by Plaintiffs, read in the light most favorable to them, simply do not permit a rational fact-finder to conclude that political animus was a motivating factor in their terminations. In light of the above, the court finds Plaintiffs have failed to establish the fourth prong of their *prima facie* case, and therefore summary judgment in Berlingeri's favor is appropriate. (See Docket No. 145.)

**C.     State Law Claims**

**Civil No. 09-1299 (GAG)**                   14

Plaintiffs' claims pursuant to Law 131 and Articles 1802 and 1803 are state law political discrimination claims identical to Plaintiffs' federal political discrimination claims in this case. Therefore, for the reasons stated above, the court **DISMISSES** these claims against Berlingeri.

**IV.   Conclusion**

For the foregoing reasons, the court **GRANTS** Defendant's motion for summary judgment (Docket No. 145).

**SO ORDERED**

In San Juan, Puerto Rico this 14th day of September, 2012.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge